IN THE UNITED STATES DISTRICT COURT
FOR THE ELEVENTH CIRCUIT
CIVIL DIVISION

Michael V. Lombardi (U.S. Opportunities, LLC), 16314-043
Federal Correctional Institution
P.O. Box 779800
Miami, FL 33177
 Plaintiff

v.

Beau Rivage, LLC
Beau Rivage Resorts, Inc.
Attn: General Council
875 Beach Blvd.
Biloxi, MS 39530



FILED by ___ SA ___ D.C.

AUG 1 1 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT
S.D. of FLA. - W.P.B.

## Complaint

The plaintiff brings this action for damages in excess of Fifty Million Dollars ($50,000,000+) against the defendant, Beau Rivage, LLC/Beau Rivage Resorts, Inc. (BR), due to their conspiracy with Royal Hospitality (RH) and others to defraud U.S. Opportunities, LLC (USO)/Michael V. Lombardi (MVL) customer's to ultimately hire illegal H2B visa workers, hence, human trafficking.  Said actions resulted in a loss of both current and future earnings.  Additionally, the plaintiff had to serve a 51 month prison sentence, which permanently damaged his name and reputation, as well as permanently severed his family relations with his wife and children.

## Jurisdiction

This case was filed in Federal Court, since the amount in controversy is greater than $10,000.  The action was filed in Federal Court in the Eleventh Circuit of the United States, since USO/MVL operated out of West Palm Beach, Florida and was a Florida Limited Liability Company.  From its inception, USO has been a Florida Company.

## Case Background

U.S. Opportunities, LLC was a company that specialized in finding H2B visa

workers for various companies throughout the United States. They performed the following services for an inclusive fee:

1.  Made arrangements with various international recruitment agencies who supplied H2B visa employees who were qualified to meet a particular employers needs.

2.  Set up interviews for the customer(s) so they could select qualified H2B visa employees.

3.  Assist the customers with the transportation process for the various H2B workers to arrive to the customer location safely (airport pick ups only).

4.  Assist in providing housing for the H2B visa workers.

5.  Refer all legal immigration matters to immigration firms who specialized and provided that expertise, directly with it's customers.  USO connected the employers directly with immigration firms to handle all the signing of all documents, that were ultimately approved by all USO's customers and signed under penalty of perjury.

6.  In short, all USO did was find temporary international H2B visa workers for employers who qualified for such workers.

In this particular instance, my company was never hired by the Beau Rivage. However, I did meet with them on an occasion and did attempt to provide services to their company.  That, in fact was my only personal contact with the company.

This in turn, unfortunately did not stop them from committing a fraud on my company as well as myself.  This occurred when the defendant conspired with RH and others to defraud my company, USO, and myself when they gave false testimony to the government to cover up their own illegal acts. They in fact used my customer's legal petitions to illegally hire H2B Visa workers to work at the BR in housekeeping positions throughout their particular season, as shown by the evidence.

- 2 -

Additionally, the workers themselves knew there was fraud, but still went along with the deception.   The simple reason was to get a job to satisfy their own needs, even if it was at the expense of another person, which in this case was my company, myself and my family.   The employees in question in this case went as far as to say she was working for another company, when in reality she knew where she was going to work.   This again, substantiates that the fraud was intentional.

These various acts were the direct cause of me being indicted, then the loss of my business, family and then finally imprisonment.   This also resulted in my reputation being permanently damaged, which will affect me for the rest of my life when I try to get a job or even if I start my own company. Finally, and most importantly, these acts permanently damaged my relationship with my wife and children, which in turn, caused me substantial physical and emotional distress.

<u>Legal Arguments</u>

<u>Count 1</u>
<u>Civil Conspiracy</u>

Conspiracy is an agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and action or conduct for an unlawful purpose.   See 18 USCA §371.

Conspiracy is a separate offense from the crime that is the object of the conspiracy.   A conspiracy ends when the unlawful act has been committed or when the agreement has been abandoned.

"Conspiracy is an elastic, spawling and pervasive offense....so vague that it almost defies definition.   Despite certain elementary and essential elements, it also, chamelon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid.  It is always 'predominately mental in composition' because it consists primarily of a meeting of minds and intent."  Krulewitch v. U.S., 336 US 440, 445-48 69 S.Ct. 716, 719-20 (1949) (Jackson, J concurring).

That occurred in this case when the various parties met and defrauded the plaintiff Michael V. Lombardi and his company, U.S. Opportunities, LLC. The culprits committed and accomplished the conspiracy.

The Beau Rivage conspired with RH and others to use USO/MVL's customer's H2B petitions in order to illegally hire H2B visa temporary workers to ultimately work at the BR in various housekeeping positions.

Refer to exhibit 2.  This is a victim statement from Imelda Nosa from the Philippines.  In line two she states she "arrived in Mississippi."  On line 8 she states, "I worked at the hotel."  On lines 19-20 she stated she "received threatening messages from the agency in the Philippines."

The hotel in exhibit 2 is the BR, which is where Imelda factually and physically worked.  The threatening messages were from one of the conspirators who arranged everything for the BR to hire these illegal H2B visa workers.  Also, Imelda was a conspirator herself, knowing she was going to work for the BR under an inappropriate H2B work visa.  Case in point.  Hyder v. Keisler, 506 F.3d 388 (5th Cir. 2007), the international workers committed a crime by deliberately lying to the U.S. Embassy abroad.  Dishonesty or lying was an essential element that involved moral turpitude.

Also, see Iqbal v. Hasty, 490 F.3d 143, 147-148 (CA 2 2007), arrested on charges of fraud in relation to identification documents and conspiracy to defraud the United States, the H2B workers conduct was "consistent with conspiracy."

Imelda Nosa factually lied in her U.S. Embassy interview, stating how she

was going to work for a customer of USO/MVL's (ARAMARK) when she factually knew she was not going to work for ARAMARK.  She conspired with the BR, RH and others so she could ultimately work for the BR.

Exhibit 3 clearly and factually shows how Imelda Nosa lied to the U.S. Embassy stating she was going to work for ARAMARK Corporation.  Exhibit 4 and 5 further completes the circle of the conspiracy.  Imelda Nosa had full travel itinerary with final destination to Biloxi, Mississippi, which is precisely where the BR was located, which indicates that she was aware of the fraud.

Therefore, it is a fact how the international H2B visa workers conspired along with the BR, RH and others so the BR could staff their resort and casino with temporary labor, deliberately not providing the American people with those jobs, in the guise of saving money for their company, which earns billions of dollars every year.

Moreover, exhibit 6 is a payroll check to an international H2B visa worker from RH for hours specifically worked at the BR, which shows that they were aware of what they were doing.  Because of the outrageous and fraudulent conduct of the defendant, USO collasped, which in turn caused the plaintiff to lose everything and additionally end up in jail.

## Count 2
### Fraudulent Misrepresentation

The four elements of fraudulent misrepresentation are: "(1)  a false statement concerning a material fact; (2)  the representor's knowledge that the represen- tation is false: (3)  an intention  that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (quoting Johnson v. Davis, 480 So. 2d 265 (fla. 1985)).

In Florida, in order to be actionable, a fraudulent misrepresentation must be of a material fact, rather than mere opinion or a misrepresentation of law. Chino Elec, Inc. v. U.S. Fid & Guar. Co., 578 So 2d 320, 323 (Fla. 3d DCA 1991).

This occurred in this case when the defendant, BR, through its fellow conspirators, made false representations on many occassions, to fulfill and accomplish the conspiracy, which in turn had a dramatic negative effect on the plaintiff. Because of these misrepresentations, the prosecutor, Annette Williams and Agent Elder, in the criminal case of U.S. v. Lombardi, knowingly and erroneously misled the Court into convicting the plaintiff of wrongdoing, specifically and factually due to the BR's conspiracy to hire illegal H2B workers at the detriment of the plaintiff.

On page 13 of the 8/15/2012 sentencing hearing, in the criminal case of the U.S. v. Lombardi, the transcripts confirm how the BR is the employer of the illegal workers and it had nothing to do with USO/MVL.  Plaintiff's former Public Defender John Weber states the following:  "the individuals that arrived to the BR were interviewed, none of them made reference to Michael Lombardi or indicated that they knew who Michael Lombardi was."

Additionally on page 14, Mr. Weber makes it clear to the court how, "there is no money trail to Michael Lombardi – – not one of these individuals make reference to Michael Lombardi in their statements to the investigators."

On page 19, Agent Elder, who was sworn in under penalty of perjury makes it clear how I had no affiliation to RH whatsoever, by the following testimony:

Mr. Weber: "Is my recollection correct that somewhere in the corporate history of Michael Lombardi, he has an affiliation with a corporation by the name of Royal Hospitality."

Agent Elder:  "Not Royal Hospitality."

There was never, at any time, any type of relationship between USO/MVL and RH or the BR.  Never one single transaction.

On page 23, Agent Elder, under penalty of perjury again states how the illegal H2B individuals went to work for the BR.  The testimony is as follows:

Mr. Weber:  "And you and your fellow agents actually interviewed some of the individuals that ended up working for the BR, correct?"

Agent Elder:   "That is correct."

The H2B individuals, on page 24 to 25, of the 8/15/2012 sentencing hearing transcript are confirmed to have left the country of the Philippines and had travel itinerary to go directly to work for the BR.   The following is the test-imony:

Mr. Weber:   "And so we have this last group of individuals that went directly to work for Royal Hospitality and the Beau Rivage."

Agent Elder:   "Yeah, there were approximately twenty something that were in LA and went directly to work from their country straight to the Beau Rivage."

Mr. Weber:   "And the ones that went straight from the Philippines to the Beau Rivage, you and the other agents interviewed most of them?"

Agent Elder:   "That's correct."

Mr. Weber:   "None of those individuals even made reference to Michael Lombardi?"

Agent Elder:   "Not to Michael Lombardi or Rebecca Najulan."

On page 27, again Agent Elder states how the H2B individuals do not know me by the following testimony:

Mr. Weber:   "The individuals that you interviewed, they, again they didn't name Michael Lombardi as their point of contact here in the U.S.?"

Agent Elder:   "Directly -- didn't mention Michael Lombardi directly, no."

This testimony factually proves how there is no such nexus between the illegally recruited H2B visa workers and USO/MVL.   Also, there is no such nexus between USO/MVL having any  type of relationship, of any kind, with the BR or RH.   USO/MVL never conducted one single transaction of business with the BR or RH.

Therefore, the above indicates and proves how there was a conspiracy that the BR and RH conducted in order to hire illegal H2B visa workers at the detriment of the plaintiff.  Moreover, this scheme the BR and RH put together was not only instrumental in getting me indicted, but also resulted in me having to serve a 51 month prison sentence.  Had such improper conduct, remarks and fraudulent practices had not been made through this conspiracy, I would have remained a free man with my reputation in tact.

The actions of the defendant prove that the misrepresentations to all the conspirators involved caused me injury.  Greenwald v. Odom, 314 Ga. App. 46, 60 723 S.E. 2d. 305 (2012), 11th Circuit.

Furthermore, the plaintiff suffered actual substantial damage and the defendant's deception was the proximate cause of the plaintiff's injuries.  This occurred when the BR, through RH made a suppression or misrepresentation of the truth with the intention either to obtain an unjust advantage for one part or to cause a loss or inconvenience to the other.  The result of their action caused permanent and irreparable damage to the plaintiff.

"In order to establish actionable fraud, plaintiffs must show that they have been damaged by the alleged fraudulent misrepresentation:  Fraud without damage, or damage without fraud, gives no cause of action, but when these two concur an action lies.  Brooks v. Dime Sav. Bank of N.Y., FSB, 217 Ga. App at 442 (1995 11th Circuit).

### Count 3

#### Tortious Interference with a Contract

The plaintiff and his company had contracts throughout the globe.  Because of the acts of the defendant, along with his partner conspirators, the result was irreparable harm to the plaintiff.

"Tortious interference with a business relationship requires a plaintiff to allege (1) the existence of a business relationship, (2) knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with the relationship, and (4) damage to the plaintiff as a result of the relationship."  Cherry v. D.B. Zwirn Special Opportunities Fund, No. 8:09-

CV-33, 2010 US Dist Lexis 6468, 2010 WL 415313, at *8 (M.D. Fla. Jan. 27, 2010) 11th Circuit.

"The law requires an existing contractual or business relation with a third party before there can be interference with that relation." Bush v. Goldman Sachs & Co., 544 So. 2d 873, 875 (Ala. 1989); see also Pouncy v. Vulcan Materials Co., 920 F. Supp. 1566, 1585 (N.D. Ala. 1996 11th Circuit).

By their own acts, the BR willfully and intentionally affected the contractual relationship between all of USO's global customers.  This interference caused irreparable injury to the plaintiff who's livelihood was destroyed, as well as being the cause for him being in prison.

"The Eleventh Circuit has stated that 'a business relationship need not be evidenced by a contract, but generally require an understanding between the parties that would have been completed had the defendant not interfered.'" E-Z Pack Mfg, LLC v. RDK Truck Sales & Serv., Inc., No. 8:10-CV-1870, 2011 US Dist Lexis 97274, 2011 WL 4343790, at *10 (M.D. Fla. Aug. 10, 2011).

That did occur here when the defendant intentionally damaged the spectacular relationship that the plaintiff had with his customers global wide, as well as his national and international reputation within the industry.

Count 4

Negligent Misrepresentation

Negligence in itself is a flexible term for failure to use ordinary care under the particular factual circumstance revealed by evidence in a lawsuit.  It is also conduct which falls below the standard established by law for the protection of other against unreasonable risk of harm. Restatement second of torts §282.

The four elements of Negligent Misrepresentation are:  (1)  there was a mis-representation of material fact; (2)  the representer either knew of the mis-representation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3)  the repre-senter intended to induce another to act on the misrepresentation; and (4)

injury resulted to a party acting in justifiable reliance upon the misrepre-
sentation.  Baggett v. Electricians Local 915 Credit Union, 620 So. 2d 784,
786 (Fla. 2d DCA 1993).

In this instance, other parties, as well as the Beau Rivage (defendant), conducted
the actual improper transactions and tried to shift such improper conduct
to me.  This in turn, caused me to be the receipient of the injury received
due to the negligent misrepresentation, since "the tort of negligent misrep-
sentation occurs when there is a breach of duty to supply correct information
to plaintiff."  Doucet v. LaFourche Parish v. Fire Protection Dist. No. 3,
589 So. 2d 517, 519 (La. Ct. App. 1991).

### Count 5
#### Intentional Infliction of Emotional Distress

To establish a claim for Intentional Infliction of Emotional Distress, a plaintiff
must allege that:  (1)  the defendant acted intentionally or recklessly; (2)
the defendant's actions were extreme and outrageous; (3)  a casual connection
between the wrongful conduct and the emotional distress; and (4) the plaintiff
suffered severe emotional distress.  Walker v. Bank of AM, N.A., 2014 US
Dist. Lexis 3829 (11th Cir. 2014).

This is what exactly happened in the instant case.  The conduct of the def-
endant was extreme and outrageous.  This is documented by the factual and
material exhibits shown, as well as the testimony from Agent Elder.  All the
evidence points directly towards the conspiracy and the major role the BR
took which directly affected the plaintiff.

These actions directly casued emotional distress to the plaintiff, due to the
BR's false and fraudulent misconduct, he had to do a 51 month prison sentence.
This in turn, shattered his family relationship which not only left him financially
without anything, but emotionally as well.

This fact is well documented by the Psychology Department at FCI-Miami prison,
which had and is currently treating the plaintiff for emotional distress.  Because
of this, he was foreced to take medication, which is well documented in his
medical records at FCI-Miami, the facility where he is currently residing.

Count 6

Tort of Outrage

A tort of outrage is a claim for intentional infliction of emotional distress and is detailed in the prior section.  However, additionally, "extreme and outrageous conduct is so extreme in degrees as to go beyond all possible bound of decency, and to be regarded as atrocious and utterly intolerable in a civil community." Twyman v. Twyman, 855 SW 2d. 619, 621 (Tex 1993). See also Van Duzer v. U.S. Bank Na.

That resulted here when the defendant, along with its fellow conspirators, employed illegal H2B visa workers, by using unauthorized petitions from other petitioners, through untruthful statements that were so extreme, that the plaintiff's life was destroyed in all matters.  He financially lost everything and additionally his personal relationship with his wife and children were completely destroyed as well.

Count 7

Defamation

The elements of Defamation are:  (1)  publication of the statement; (2)  falsity; (3)  negligence as to the statement's falsity; (4)  actual damages; and (5) the statement must be defamatory.  Ward v. Casual Rest. Concepts, INc., No.: 8:10-CV-2540, 2011 US Dist. Lexis 69712, 2011 WL 2600511, at *6 (M.D. Fla. June 29, 2011).

A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se.  See, E.G., McLver v. Tallahassee Democrat, Inc., 489 So. 2d 793, 794 (Fla. 1st DCA 1986); Diplomat Electric v. Westinghouse Electric Supply Co., 378 F.2d 377, 383 (5th Cir. 1967).

This occurred in this case when the remarks and actions of the defendant led to me being first criminally indicted and then being convicted to a 51 month prison sentence.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  Ascroft v. Iqbal,
556 US 662, 129 S.Ct. 1937, 1949, 1732 Ed. 2d. 868 (2009).

## Count 8
### Tortious Interference with Business Relationships

The tortious interference with business relationship "occurs when a person
unlawfully diverts prospective customers away from one's business."  Par
Indus., Inc. v. Target Container W., 708 So. 2d 44, 48 (Miss. 1998); See
also Cenac v. Murray, 609 So. 2d 1257, 1268.  This case explains that tortious
interference with a business relationship occurs "when a wrongdoer unlawfully
diverts prospective customers away from one's business thereby "encouraging"
customers to trade with another."

The elements to prove such a claim are:  "(1)  the acts were intentional and
willful; (2)  the acts were calculated to cause damage to the plaintiffs in
their lawful business; (3)  the acts were done with the unlawful purpose
of causing damage and loss, without right or justifiable cause on the part
of the defendant (which constitutes malice); and (4) actual damage and loss
resulted."  MBF Corp v. Century Bus Commc Ins. Inc., 663 So. 2d 595,
598 (Miss. 1995).  Also see United Brand Inc., v. Tenders, 868 F. Supp.
2d 572 (5th Cir. 2012, as well as PDN, Inc. v. Loring, 843 So. 2d 685, 688
(Miss. 2003).

This occurred in this case, due to the acts of the BR when they illegall hired
H2B visa workers, when they fraudulently used USO's customer's petitions
as the mechanism to have the H2B visa workers travel directly to Biloxi,
Mississippi to work for them and when they conspired with all other parties
to accomplish the fraudulent and criminal activity.

The BR deliberately gave fraudulent information to the H2B workers, which
directly impacted me and my family in the worst possible way  that is con-
ceivable.  It can be proven beyond any doubt that the BR is responsible for
the fraudulent criminal acts they participated in through their lies and material
false statements.

These acts were intentional and willful, since when they made the remarks

and put forth their remarks into action, they knew they were false.   The
acts themselves caused damage to the plaintiff in his lawful business.   They
were conducted with unlawful purpose, making material and damaging mis-
statements and finally actual damage did, in fact result.   This was monetary
in nature, since all current and future earnings were lost, as well as the
plaintiff's business relationships with all his customers globally.   Furthermore,
his right to liberty was taken away with a 51 month prison sentence and
inappropriate restitution.   "Words which are actionable in themselves, or
per se, necessarily import general damages and need not be pleaded or proved
but are conclusively presumed the result."   Bobenhausen v. Cassat Ave.
Mobile Homes, Inc., 344 So. 2d at 281 (Fla. 1st DCA 1977).

"Similarly, a cause for action for tortious interference with business relations
does not accrue until existing negotiations, which are personally certain of
resulting in a contract, are interferred with such that the negotiations terminated
and harm to the plaintiff results."   Hill v. Heritage Resources, 964 SW 2d.
89, 116 (Tex: App-El Paso 1997 pet. denied): Million v. AM Int'l Group,
Inc., 2005 US Dist. Lexis 8864 (5th Cir. 2005).

In the instant case, contracts existed with customers throughout the globe,
which grew larger through time and this was interfered with, since all my
current and future contracts were terminated within the industry.   The end
result was the entire global business collapsed and caused damage to a reputation
that will be impossible to reestablish.   My reputation is 100% irrepairable.

### Count 9
#### Malice

A defendant acts with actual Malice if the defamatory statement is made with
"knowledge that it was false or with reckless disregard if it was false or
not."   New York Times Co. v. Sullivan, 376 US 254, 289-290, 84 S.Ct. 710
11 Ed. 2d 686 (1964); Wallace v. Perry, 423 B.R. 215 (5th Cir. 2010).

Additionally, it should be noted that malice may be proved through either
direct or indirect circumstantial evidence.   Thus, if a plaintiff proves that
the defendant's defamatory statements were made with malice by clear and
convincing evidence, a court may impose punitive or exemplary damages."

Evidence is clear and convincing if it supports a firm conviction that the facts to be proved are true." <u>Transportation Insurance Co. V. Mariel</u>, 879 SW 2d. 10, 23 (Tex 1994); see also <u>Wallace v. Perry.</u>

That is the case here, since plaintiff can prove with clear and convincing evidence that the defendant's statements, actions and remarks were not only false, but the defendant knew they were false when they made them, which directly affected the plaintiff.  The fact is easily documented and shown specifically within the enclosed exhibits and quoted testimony in federal court. It is factually known that the BR conspired with others to hire illegal H2B visa workers, who obtained their H2B visa under false pretenses and worked directly on the BR property.

Their actions, which are documented, speak louder than words.  There is no doubt whatsoever that their actions were deliberately done and did cause harm to the plaintiff.  Moreover, since they were the one's who caused the damage, they are responsible for making the plaintiff whole.

<u>Damages</u>

In computing the amount of damages, many things have to be considered. Monetary damages, which include current earnings, as well as future earnings. In addition, based on the significance of the permanent and irreparable harm, punitive damages can also be considered, since the defendant should further be punished for their actions.

Any person having suffered injury from defamation is entitled to recover damages.  Florida law recognizes two categories of compensatory damages for defamation:  general and special.  <u>Bobenhausen v. Cassat Ave. Mobile Homes, Inc.</u>, 344 So. 2d 279, 281 (Fla. 1st DCA 1997).

General damages are those which the law presumes must naturally, proximately and necessarily result from publication of the libel or slander.  They are allowable whenever the immediate result is to impair the plaintiff's reputation, although no actual pecuniary loss is demonstrated.  20 Fla. Jur. <u>Libel and Slader</u> sections 6, 88. <u>id.</u>  Special damages, on the other hand, "do not

- 13 -

result by implication of law, and "it is necessary for a plaintiff to show his special damages proximately resulted from the defamation." Bobenhausen, 344 So. 2d at 281.

Compensatory damages are not limited to out-of-pocket loss. Gertz v. Welch, Inc., 418 US 323, 94 S. Ct. 2997, 41 L.Ed. 2d 789 (1974). The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering. id.

"Of course,...all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." Gertz, 418 US at 349, 94 S.Ct. 2997, 41 L.Ed. 2d 789.

There is "considerable flexibility in the form of necessary proof of damages. What money a business would have made but for the interference of another party has to be estimated." Lynn v. Soterra Incorporated, 802 So. 2d 162, 170 (Miss. App. Ct. 2001).

Furthermore, in AmSouth Bank v. Gupta, 838 So. 2d. 205, 214 (Miss. 2002), addressed the necessity of customer diversion to demonstrate interference with business relations holding that "while the tort has its origin in efforts of a third party directed against a plaintiff's customers, conduct interferring with the plaintiff may suffice."

Moreover, the proof in such a case must provide such certainty at the nature of the particular case may permit to "enable the trier of facts to make a fair and reasonable estimate of the amount of damage." Id at 171 (citing Freeman v. Huseman Oil Intern, Inc., 717 So. 2d. 742, 746, (Miss. 1998). Also, "where it is reasonable certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.... the plaintiff will not be denied substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating the loss." Raines v. Bottrell Insurance Agency, Inc., 992 So. 2d. 642, 647 (Miss. Ct. App. 2008) (citing Cain v. Mid-South Pump Co., 458 So. 2d 1048, 1050 (Miss. 1984).

In fact, in <u>Koehring Company v. Hyde Construction Co.</u>, 254 Miss. 214, 178 So. 2d 838, 854 (Miss. 1965), the Mississippi Supreme Court held "that a party will not be able to escape liability because of lack of perfect measure of damages...."  Therefore, a reasonable basis for computation and the best evidence, which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of the loss is sufficient proof."

In summary, the damage is provable and it is extensive.  There was proximate causation and it was forseeable for without their false statements, the plaintiff would have not be indicted.  There is no question that because of their erroneous statements is why, in fact, the plaintiff was indicted, which caused him to lose his business and permanently damaged his reputation.  This is irrepairable damage.

The plaintiff has direct evidence, which proves the existence of fact without inference or presumption.  <u>Morris v. Emory Clinic, Inc.</u>, 402 F.3d 1076, 1081 (11th Cir. 2005).

Therefore, plaintiff request punitive damages as well, since traditionally punitive damages are "awarded in addition to actual damages when the defendant acted with recklessness, malice or deceit," and these damages are viewed as a "way of penalizing the wrongdoer."  <u>Cooper Industries v. Leatherman Tool</u>, 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed 2d. 674 (2001).

Furthermore, when determining damages, the court cannot forget that "compensatory damages are intended to redress the concrete loss that plaintiff has suffered by reason of the defendant's wrongful conduct.  Punitive damages, which have been described as 'quasi-criminal', operate as 'private fines' intended to punish the defendant and to deter future wrongdoing."  See also <u>Schroeder v. Greater New Orleans Credit Union</u>, 2012 U.S. Dist. Lexis 171139 (5th Circuit).

Therefore, in summary, the plaintiff should be entitled to punitive, as well as compensatory damages.

## Trial by Jury of my Peers

Because of the extensive amount of facts, as well as damages, such like this occurs on a way too often basis, a trial by jury of his peers is what is desired by the plaintiff.

## Conclusion

Based upon all the illegal acts done to the plaintiff, as well as the long and short term effects on his financial condition, the plaintiff hereby requests a settlement in excess of Fifty Million dollars, which includes compensatory, as well as punitive damages.  Also, all litigation costs and attorney's fees.


Respectfully submitted,



_____          _____
Michael V. Lombardi                 Date  8/7/2014

PERJURY STATEMENT

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this motion was placed in the prison mailing system on _____ 8/7/2014 _____.

                                         (month, date, year)

Executed (signed) on_____ 8/7/2014 _____ (date).

_____

Signature of Michael V. Lombardi

EXHIBIT 2



FINAL DESTINATION
IS MISSISSIPPI. JUST
LIKE EXHIBIT 5.

: NEVER HAD A HOTEL
+ S A CUSTOMER.
EMPLOYER WAS
DYAL HOSPITALITY
AND THE BEAU RIVAGE.



DYAL HOSPITALITY.
NOT ME.

### VICTIM IMPACT STATEMENT OF IMELDA NOSA

1

2  My name is Imelda Nosa.  When I arrived in Mississippi, I was told to sign a new

3  contract, with a different company, and for lower wages than what I had agreed to.  I immediately

4  felt shocked and confused when I realized that my pay would be lower than what was promised,

5  and that the rent would be much more.  During the first few weeks in Mississippi, I didn't have

6  enough money to eat.  I pooled what little money I had with other workers so that everyone would

7  at least have a little food.

8       When I worked at the hotel, I realized that it would be impossible to complete the amount

9  of work assigned to me.  I worked as hard as I could because my employer told me that I would

10 be fired and deported if I didn't finish working.  I was constantly exhausted and afraid.  My

11 employer monitored us at the apartment, and always seemed to know if we left for any reason.  I

12 felt imprisoned.

13      After one worker escaped, the employer came to our apartment very angry said if we tried

14 to escape we would be "putting our lives in danger."  I feared that I would be physically harmed

15 if I tried to leave.  I received very little pay, and when I spoke with my husband in the Philippines

16 on the phone, he told me that loan companies were calling.  I felt helpless because I wasn't

17 earning what I had been promised and had no way to pay back loans I had taken out to come

18 work here.  I felt increasing stress and fear.

19      After we escaped, my husband received threatening text messages from the agency in the

20 Philippines.  They know where my family lives, and every day I worry that these people will do

21 something to me or my family.

22 Executed this ___2nd day of April, 2012, at Los Angeles, California.

23

24                                              _____

25                                              Imelda Nosa

26

27

28

I

VICTIM IMPACT STATEMENT OF IMELDA NOSA

PLEASE NOTE THE VICTIMS DID NOT KNOW ME, WHICH SUBSTANTIATES MY
NON-INVOLVEMENT.

EXHIBIT 3



**Philippine
Overseas
Employment
Administration**

Republic of the Philippines
Department of Labor and Employment
BF6 Building, Ortigas Avenue, EDSA, Mandaluyong City 1501
Website: www.poea.gov.ph   E-mail: info@poea.gov.ph
Hotline: 722-1144, 722-1155



Name Hire Assistance Division
Compliance Letter
FM-POEA-03-LB-14 (04)
EFFECTIVITY DATE: 3 November 2008

Fax no.: (632) 7221176

| | | |
|---|---|---|
| Name of Employer | : | ARACELEE IAFSA VERDE |
| Name of Worker | : | IMELDA G. NASA |
| Position | : | COMBINED FOOD PREPARATION AND SERVING WORKER |
| Jobsite | : | MANCOS   COLORADO   U.S.A |
| Date | : | JULY 5, 2010 |

→ VICTIMS APPROVAL
WITH P.O.E.A. I HAD
NO INVOLVEMENT.

THE VICTIMS/CO-CONSPIRACY
LIED TO THE P.O.E.A. TO
OBTAIN THIS APPROVAL.

THEY NEVER ARRIVED TO
COLORADO. SEE EXHIBIT
5. BILOXI WAS FINAL
DESTINATION.

Please confirm compliance and inclusion of additional terms and conditions of the employment contract marked XXX below for the processing of the travel documents of the above-named worker(s) by signing in the space provided below.

_____ 1. Basic salary _____ for regular work hours and _____ for overtime pay, as appropriate.
_____ 2. Transportation cost to worksite and return to the point of hire at employer's expense.
_____ 3. Free food and accommodation or offsetting benefits.
XXX 4. Just causes of termination of the contract.

a. Termination by employer: The employer may terminate this Contract on the following just causes: serious misconduct, willful disobedience of employer's lawful orders, habitual neglect of duties, absenteeism, insubordination revealing secrets of establishment, when employee violates customs, traditions and laws of host country and/or terms of this agreement. The employee shall shoulder the repatriation expenses.

b. Termination by employee: The employee may terminate this Contract without serving any notice to the employer for any of the following just causes: serious insult by the employer or his representative, inhuman and unbearable treatment accorded the employee by the employer or his representative, commission of a crime/offense by the employer or his representative. The employer shall pay the repatriation expenses back to the Philippines.

XXX 5. In the event of death of the employee during terms of this agreement, his remains and personal belongings shall be repatriated to the Philippines at the expense of the employer. In case the repatriation of remains is not possible, the same may be disposed of upon approval of the employee's next of kin and/or by the nearest Philippine Embassy or Consulate at the worksite, at the employer's expense or offsetting benefits.

_____ 6. Failure to perform according to the standards agreed upon between the employer and the worker within the first twelve (12) weeks of the contract shall be a ground for termination of the worker in lieu of the provision on probationary period.

_____ 7. Other Requirements/Provisions:

ELMIRA C. STO DOMINGO
Director II- Landbased Center

JUL 0 6 2010

Company seal

Signature of Employer: _____
Printed Name of Employer: Violet Kelly
Official Designation: HR Director

EXHIBIT 4

checkmytrip.com - your travel itinerary

Page 1 of 2

### your trip reservation

Booking reservation number: 2VRWKX

• We recommend you make a note of the booking reservation number or print this page.

#### traveller information

Mr Mario Abaday

#### e-ticket numbers

Only e-ticket numbers are displayed when they are issued.

Document 006-2728526637: Manila - Los Angeles  Mario Abaday

#### your flight selection

Airline confirmation number(s): Delta Air Lines C4K4SQ

**Manila to Los Angeles**

| | |
|---|---|
| Flight 1 confirmed | Sunday, July 18, 2010 |

Departure:   07:40  Manila, Philippines -   Ninoy Aquino International , terminal I1
Arrival:   13:10  Tokyo, Japan -   Narita , terminal 1

| | | | |
|---|---|---|---|
| Airline: | Delta Air Lines DL172 | Duration: | 4:30 |
| Fare type: | Economy Restricted | Aircraft: | Boeing 747-400 |
| Baggage: | 2 piece(s) per traveller | Last check in: | Information not available |
| | | | current flight status |
| | BREAKFAST | | |

Change of plane required. Time between flights = 2:20.

| | |
|---|---|
| Flight 2 confirmed | Sunday, July 18, 2010 |

Departure:   15:30  Tokyo, Japan -   Narita , terminal 1
Arrival:   09:45  Los Angeles, USA -   Los Angeles International , terminal 5

| | | | |
|---|---|---|---|
| Airline: | Delta Air Lines DL284 | Duration: | 10:15 |
| Fare type: | Economy Restricted | Aircraft: | Airbus Industrie A330-200 |
| Baggage: | 2 piece(s) per traveller | Last check in: | Information not available |
| | | | current flight status |
| | DINNER | | |

**Flight payment**
Air Fare not Available

*[handwritten note in left margin:]* VICTIM FLIGHT TINERARY. I HAD NO INVOLVEMENT



EXHIBIT 6

**NOT MY COMPANY. I NEVER WORKED WITH THIS COMPANY AND/OR CONTRACTED WITH THEM.**

ROYAL HOSPITALITY SERVICES LLC
237 N. Peters Street, 4th Floor
New Orleans, LA 70130
5043248741

NO. 00017036

| Date | Amount |
|------|--------|
| 10/20/10 | *************** $52.25 |

Pay To The Order Of
IMELDA G GUILLERMO
1161 JUDGE SEKUL AVENUE
APT 174
BLOXI, MS 39530

FIFTY TWO and 25/100 DOLLARS

Authorized Signature

"017036" ⑆065403626⑆ 00 9484 3674"

RETMOVE DOCUMENT ALONG THIS PERFORATION

ROYAL HOSPITALITY SERVICES LLC Employee Pay Stub
IMELDA G GUILLERMO

Paid Date: 10/20/2010          Check Number: 017036
Pay Period: 9/20/2010 through 10/3/2010

| EARNINGS | | CURRENT PERIOD | | | | | YEAR TO DATE | |
|----------|--|-------|-------|------|--------|-------|--------|--------|
| | | UNITS | HOURS | RATE | AMOUNT | UNITS | HOURS | AMOUNT |
| Regular | 2003 - | | | | | | 125.90 | $1,007.20 |
| Gratuity Tips | 2001 - | | | | | | | $3.06 |
| Piece Rate | 2001 - | | 11.30 | 24.76 | $52.25 | 309.50 | | $1,470.13 |
| | TOTALS | 11.00 | 0.00 | | $52.25 | 309.50 | 125.90 | $2,470.39 |
| **TAXES** | | | | | | | | |
| Federal | Single - 2 | | | | $0.00 | | | $128.30 |
| US State | Single - 0 | | | | $0.00 | | | $36.00 |
| Social Security | 6.20% | | | | $0.00 | | | $0.00 |
| Medicare | 1.45% | | | | $0.00 | | | $0.00 |
| **DEDUCTIONS** | | | | | | | | |
| Housing | | | | | $0.00 | | | $720.00 |
| | | | | NET PAY | $52.25 | | | $1,586.09 |

**I DID NOT AND WOULD NOT HAVE DEDUCTED FROM THEM.**

**ESTITUTION INAPPROPRIATE.**

Review Your Personal Compensation Online at: www.ssurefserve.com
Your User Name is 110449
Your password is the last 4 digits of your Social Security Number



Vincent Lombardi 16314043
Federal Correctional Institute
P.O. Box 779800
MIAMI, FL 33177

Paul G. Rogers Federal Building
(Clerk of the Court)
U.S. Courthouse
701 Clematis St. Room 402
West Palm Beach, FL 33401

U.S.M.S. INSPECTED BY:

USPS TRACKING #

9114 9011 5981 8975 3451 21

Label 400 Jan. 2013
7690-16-000-7948

UNITED STATES
POSTAL SERVICE®